**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN PETERSEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 13 C 4527 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| RAY MABUS, Secretary, Department of the Navy, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

After Plaintiff John Petersen was found permanently unable to perform his job as a firefighter/paramedic at the Great Lakes Naval Base ("Great Lakes"), the Department of the Navy (the "Navy") reassigned him to a dispatch supervisor position. Unhappy with his treatment, Petersen filed suit against Defendant Ray Mabus, Secretary of the Navy, alleging failure to accommodate his disability in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 791 *et seq.*, retaliation in violation of Title VII, 42 U.S.C. § 2000e *et seq.*, and the Rehabilitation Act, and age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623 *et seq.* Before the Court is the Navy's motion for summary judgment. Because Petersen has raised genuine issues of material fact on the failure to accommodate and retaliation claims, the Court denies summary judgment on those claims. But because no reasonable juror could infer age discrimination from the evidence before the Court, the Court grants summary judgment for the Navy on the age discrimination claim.

# BACKGROUND[1]

## I.     Petersen's Employment with the Navy

Petersen, who was born in 1968,[2] began working at Great Lakes in its Fire Department as a firefighter/EMT in 2006.  In 2008, the Navy promoted him to a firefighter/paramedic position.  As a firefighter/paramedic, Petersen worked six days of every two-week period in 24-hour shifts.  He received premium pay and was eligible for a special law enforcement officers ("LEO") retirement benefit after he met specific age and service requirements.

In 2008 and 2009, Petersen suffered back injuries but was cleared to return to full-duty status as a firefighter/paramedic.  On July 17, 2010, he again injured his back while working.  Petersen filed a claim with the Office of Workers' Compensation Programs ("OWCP"), which is administered through the Department of Labor ("DOL").  The Navy placed him on light-duty status, which was typically reserved for employees who had sustained work-related injuries.  On light-duty status, a firefighter/EMT performed the physical parts of Petersen's paramedic job while Petersen provided medical assistance.  Petersen also performed administrative duties in the office, responded to trouble alarms after hours, and received extra time to stretch.  Petersen could not recall a time when he arrived for a shift and there was no light duty work for him.  The Fire Chief, Mike Chaney, indicated that there was no limit to the length of time an injured employee could spend on light-duty status in the Fire Department as long as the Navy received some assurance that the employee would return to full duty as a firefighter.

---

[1] The facts in this section are derived from the Joint Statement of Undisputed Material Facts and the attached exhibits.  *See* Doc. 41.  All facts are taken in the light most favorable to Petersen, the non-movant.

[2] The Court takes Petersen's date of birth from his complaint and the Navy's answer.  The parties have not included this fact in their Joint Statement, instead taking it as established that Petersen is entitled to the ADEA's protections.

In fall 2010, Petersen returned to full-duty work as a firefighter/paramedic but soon thereafter reinjured his back and resumed light-duty status. He was referred to Dr. David Zeman, an orthopedic specialist, who put Petersen through a work hardening program in spring 2011 that involved therapy, lifting, and the physical aspects of his firefighter/paramedic job. In June 2011, however, Dr. Zeman determined that Petersen's back injury was permanent and that Petersen was unable to perform the essential functions of his job as a firefighter. Dr. Zeman informed OWCP's claims examiner Matthew Griffin of this conclusion in a June 24, 2011 letter.

Upon learning that Petersen was permanently unable to perform his firefighter/paramedic job, the Navy sought to place Petersen in an available position for which he was qualified and which accommodated his medical restrictions. The Navy worked primarily with Suzanne Lambert and Bruce Burns, workers' compensation coordinators in Great Lakes' human resources department. Lambert and Petersen had spoken before June 2011 about possible reassignments, at which time Lambert identified a vacant fire protection inspector role. At the time Petersen was in need of a new position, however, the fire inspector role was no longer available. Petersen wanted a position equal in pay and benefits to those he received as a firefighter/paramedic, but the only vacant position that the human resources department identified as vacant at that time was a public safety dispatch supervisor, which was not eligible for LEO benefits. The Navy proceeded to investigate this opportunity nonetheless, contacting Dr. Zeman on July 25 to determine whether Petersen could perform the job's duties, which involved supervising and evaluating 911 call takers and emergency response equipment dispatchers. Dr. Zeman responded on August 22, indicating that the position was suitable while suggesting that telecommuting or flexible scheduling would also be appropriate.

The Navy offered Petersen the public safety dispatch supervisor position on September 6 at the Grade 8/Step 1 level with an annual salary of $47,076. The job offer stated that if Petersen declined the position but OWCP determined that he could perform the job, his benefits under the Federal Employees' Compensation Act, aside from medical benefits, would be terminated, but that if he accepted the position, information related to loss of wage earning capacity would be provided to the OWCP claims examiner. But unlike job offers to other injured firefighters, including Jeff Peters and Russ Staley, Petersen's offer did not indicate that the job would remain available until OWCP made its determination as to the offer's validity. Petersen was originally given until September 25, 2011 to respond to the job offer, which was then extended to October 5. On September 23, Petersen wrote to OWCP's Griffin, asking OWCP to verify whether the offer was valid and expressing concern over the salary and benefits, as Petersen was at Grade 9/Step 4 as a firefighter/paramedic and earned $57,193 as his annual base salary with LEO benefits. Petersen then requested to have until December 10 to respond to the job offer, indicating he was waiting for information from Griffin. Petersen testified that Griffin led him to believe that Great Lakes would send OWCP a list of open positions, that Griffin would then send those to Petersen, and that after Petersen provided a list of his certifications, Griffin would select one of the positions from the list. But when Petersen initially called Griffin to discuss the dispatch supervisor position, Petersen testified that Griffin claimed not to be aware of it, despite the fact that the DOL Claims Examiner and the OWCP district office in London, Kentucky, in which Griffin was based, were both copied on the September 6 job offer letter.

On October 8, Petersen received a revised job offer for the dispatch supervisor position at an increased grade/step level, Grade 8/Step 7, with an annual salary of $56,489. Petersen was given until October 20, 2011 to respond, but he signed the acceptance paperwork that day even

though he had not heard back from Griffin as to whether OWCP considered the offer valid. Petersen testified he did so because Andrew Arndt, the Assistant Fire Chief and his direct supervisor, and Burns told him that he would not receive an extension of time on this offer. Burns did, however, contact OWCP several times to ensure that Great Lakes was following the appropriate process in offering Petersen the position. On November 9, Griffin sent Petersen a letter stating that the dispatch supervisor position was suitable and that if Petersen did not report to the position, his right to compensation would be terminated.

Once Petersen began his dispatch supervisor job, OWCP paid him the difference between his base salary in that position and his base salary as a firefighter/paramedic. But Petersen continued to complain about the loss of premium pay (for the overtime that he had worked as a firefighter/paramedic), save pay (the fact that he did not maintain his current pay status when he was moved to a lower level position),[3] and his LEO status. On October 20, 2011, in response to Petersen's complaints that he had been offered reassignment to a non-LEO eligible position, Gelacio Rodriguez, the Deputy Fire Chief, wrote to Petersen explaining that the Navy was not required to place Petersen in a covered position just so that he could retain his LEO benefits. Rodriguez also stated that the legislative intent behind the LEO provision was "to provide for early retirement based on a determination that particular positions should be composed of young men and women physically capable of meeting the vigorous demands of occupations that are far more physically taxing than most in the Federal service." Ex. 13 to Joint Stmt. of Facts at 1. He continued that a primary position for LEO purposes (such as a firefighter) was one "so rigorous that employment opportunities should be limited through establishment of a maximum entry age and physical qualifications, to young and physically rigorous individuals, whose primary duties

---

[3] Both Cheney and Arndt testified that they were allowed to retain the same pay when they moved from a higher position to a lower position within the Fire Department.

are to perform work directly connected with controlling and extinguishing fires." *Id.* Rodriguez also discussed the requirements for a position to be considered a secondary position for LEO purposes, including that it be in the firefighting field. Because the dispatch supervisor position did not meet those requirements and Petersen could not perform a firefighter's duties, Rodriguez concluded that the Navy was not discriminating against Petersen by placing him in a non LEO-eligible position.

On November 18, 2011, Petersen sent a letter to OWCP, Great Lakes' human resources department, and its EEO office, contending he should have been placed in a position with pay and benefits equal to those he enjoyed in the firefighter/paramedic role and complaining that he had been discriminated against by being placed in the dispatch supervisor position. After Petersen sent this letter, he testified that he was told he could no longer speak with Arndt and that he was to work instead with an individual in Crane, Indiana. According to Petersen, however, that individual also stopped working with him, leaving him to communicate only with Carla Camara, Great Lakes' Deputy EEO Officer.

In Petersen's letter, he indicated that he was interested in the health and safety officer or fire inspector positions, which were both LEO-eligible. The health and safety officer position had been posted before Petersen was injured in June 2010 but had never been filled. Chaney testified that the job had not been filled because of a lack of funding and that Arndt instead had absorbed the duties of that position. As for the fire inspector position, it had been offered as an accommodation to another injured firefighter, Jeff Peters, who is younger than Petersen, by the time the Navy was looking to reassign Petersen to a new position. But Peters had not yet accepted the fire inspector position, as he was waiting for OWCP to determine whether he could

return to work as a firefighter based on the conflicting opinions of his own doctor and the Navy's doctor. In December 2011, OWCP cleared Peters to return to full duty as a firefighter.

Once the fire inspector position became available in December 2011, there were discussions in the Fire Department and within Great Lakes' human resources department about placing Petersen in the position. Bridgett O'Hara, who worked in Great Lakes' human resources department, and Chaney both believed Petersen could be placed in the position once it became available. But the decision was made to offer the position to Petersen only as part of a written settlement of his EEO claim and not to speak about the position outside of the settlement context. Additionally complicating the situation was the fact that Petersen had been transferred from an LEO position to a non-LEO position, causing a break in benefits. The relevant regulations provided that an employee was required to transfer directly from one LEO position to another without a break in service to maintain LEO coverage, so O'Hara proposed using the settlement agreement to rescind the dispatch reassignment and retroactively reassign Petersen to the fire inspector position so as to avoid a break in service and allow Petersen to retain the LEO benefit. The Navy also sought Dr. Zeman's input on whether the fire inspector position was suitable to Petersen's restrictions, receiving a response dated March 5, 2012 that the position was suitable if Petersen was not lifting more than 25 pounds.

There are different accounts regarding whether the fire inspector position was actually offered to Petersen. Chaney, who retired from the Navy effective April 30, 2012, testified that he never received the approval to offer Petersen the job and believed there may not have been money in the budget to do so. Arndt believed that it was not offered to Petersen because he had already accepted the dispatcher position. Petersen testified that when he attended an EEO mediation on January 4, 2012, Chaney stated that the only way Petersen would be considered for

another position was if he left his superior officers alone and stopped filing EEO complaints. But Petersen also testified that he was offered the fire inspector position during an EEO mediation but did not accept it because "[i]t was a further demotion." Ex. 1 to Joint Stmt. of Facts 104:12–13. In July 2012, Petersen applied for disability retirement because he was unable to perform the firefighter/paramedic position, which was approved.

## II. Comparators

Petersen provides several proposed comparators. As already discussed, Jeff Peters was a younger firefighter who was initially injured in 2004. The Navy placed him on light-duty status for multiple years because his doctors did not agree whether he could return to full-duty status. The Navy offered him reassignment to a fire inspector position several times, with the last offer dated September 1, 2011. Peters accepted that position on October 31, 2011, but then was cleared to return to work as a firefighter in December 2011.

Mark Hansen was a firefighter at Great Lakes who sustained injuries while working and the Navy placed him on light-duty status on and off for several years. Hansen would be cleared to return to work, perform the full duties of a firefighter for some time, get reinjured, and then perform light-duty work until he was again cleared to work. About three or four months before Hansen was eligible for retirement, however, the Navy learned that Hansen would not improve and could not return to full-duty status. Arndt testified that at that time, Chaney decided to allow Hansen to remain on light-duty status and retire from the Fire Department because the amount of paperwork and process it would take to find a permanent position for Hansen would likely exceed the time remaining for Hansen to reach his retirement date.

Russ Staley was another firefighter who suffered an on-the-job injury in 2007 and whom the Navy placed on light-duty status for over a year while a dispute over his fitness for duty was

resolved.  Ultimately, the Navy certified Staley as permanently disabled and placed him in an open and funded fire inspector position in January 2010.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56. To determine whether a genuine issue of fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record.  Fed. R. Civ. P. 56 & advisory committee's notes.  The party seeking summary judgment bears the initial burden of proving that no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine issue for trial.  *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000).  Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## ANALYSIS

### I.       Failure to Accommodate Claim

To prevail on his failure to accommodate claim, Petersen must establish that (1) he is a qualified individual with a disability, (2) the Navy was aware of his disability, and (3) the Navy failed to reasonably accommodate his disability.  *Brumfield v. City of Chicago*, 735 F.3d 619,

631 (7th Cir. 2013). The Navy concedes the first two elements for purposes of summary judgment, and thus the Court need only examine the third element.

The Navy argues that it fulfilled its obligations by providing Petersen with a temporary light-duty assignment and, when it became clear that he could not return to his firefighter/paramedic position, by placing him in the vacant safety dispatch supervisor position. But Petersen claims that the Navy failed to accommodate him because the dispatch supervisor position was not LEO eligible and left him with a lower earning capacity. Petersen maintains that the Navy should have considered him for other open positions for which he was qualified or allowed him to remain on light-duty status until an LEO-eligible position became available.

"An employer may be obligated to reassign a disabled employee, but only to vacant positions; an employer is not required to 'bump' other employees to create a vacancy so as to be able to reassign the disabled employee." *Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir. 1996). Petersen claims that there were two vacant LEO-eligible positions at the time he was seeking permanent reassignment. But he has acknowledged that the Navy chose not to fill the medical health and safety officer position because of funding issues and that Arndt absorbed those duties instead. As a result, this position was not vacant at the relevant time and the Court need not consider it for purposes of Petersen's failure to accommodate claim. *See Ozlowski v. Henderson*, 237 F.3d 837, 841 (7th Cir. 2001) ("We do not believe that a reasonable accommodation means that an employer is required to fill a position which, based on a reason wholly independent of the employee's disability, it had chosen not to fill. Such a position is not 'vacant.'"); *Davis v. Chao*, No. 06 C 1066, 2008 WL 905184, at *12 (N.D. Ill. Mar. 31, 2008) (position not vacant where posting was cancelled and never filled because employer decided to reduce number of district directors).

Petersen also complains that he was not placed in the fire inspector position. The Navy responds that this position was not vacant because it had been offered to Peters before Petersen's doctors determined that he was permanently disabled. Petersen has agreed that by June 2011, the fire inspector position had been offered to Peters. This again means that the fire inspector position was not vacant at the time the Navy was seeking to reassign Petersen. *See Winfrey v. City of Chicago*, 259 F.3d 610, 618 (7th Cir. 2001) ("A position is not considered vacant if the employer has a legitimate reason, unrelated to the employee's disability, for reserving the position for others."); *Hill v. Excel Corp.*, No. 04-3083, 2005 WL 3358866, at *3 (C.D. Ill. Dec. 9, 2005) (position not vacant where being held open for another employee while he was on FMLA leave). Although Petersen alludes to the fact that the fire inspector position became available in December 2011, after he was already reassigned to the dispatch supervisor position, he does not develop any argument as to why the Navy had an obligation to place him in that position in December 2011 or whether the Navy's duty to accommodate continued once it had already placed him in a permanent position. *See Economy Folding Box Corp. v. Anchor Frozen Foods Corp.*, 515 F.3d 718, 721 (7th Cir. 2008) ("It is not the court's responsibility to research the law and construct the parties' arguments for them."). Even assuming such an obligation, Petersen testified that the Navy offered him the fire inspector position in 2012 but he did not accept it because "[i]t was a further demotion." Ex. 1 to Joint Stmt. of Facts 104:12–13. This admission defeats any claim that the Navy failed to accommodate Petersen by not placing him in the fire inspector position once it became available in December 2011. *Cf. Davis*, 2008 WL 905184, at *13 (when employee "requests a transfer as reasonable accommodation and the employer offers alternative reasonable accommodation, which the employee then refuses, the

employer cannot be liable for failing to reasonably accommodate the employee by not transferring him to another position").

Putting aside Petersen's complaints about these positions, his real issue appears to be that the Navy required him to accept the dispatch supervisor position instead of allowing him to remain in a light-duty position until an LEO-eligible position became available. The fact that the dispatch supervisor position constituted a demotion does not of itself mean that the Navy violated its duty to reasonably accommodate Petersen. *See Dalton v. Subaru-Isuzu Automotive, Inc.*, 141 F.3d 667, 678–79 (7th Cir. 1998) (class of jobs to be considered when considering employer's duty to accommodate includes those where transfer would represent a demotion). But Petersen argues that other injured firefighters were allowed to remain on light duty for multiple years, with Hansen remaining on light duty even after his doctor diagnosed him with a permanent condition and Peters remaining there after one of his doctors indicated he could not return to the firefighter position. Based on the treatment of these individuals, Petersen maintains the Navy also should have accommodated his desire to remain on light-duty status until an LEO-eligible position became available. Peters is not a valid comparator, however, as the Navy was faced with competing opinions regarding whether he could return to full-duty status as a firefighter. The Navy thus allowed him to remain on light-duty status while resolving the conflicting opinions. But Hansen's situation is more problematic, as it suggests that light-duty status was used in other cases for those with permanent diagnoses, although in Hansen's case, he remained there only for several months until he reached retirement age.

It is widely accepted that an employer has no "duty to reassign an employee to a permanent light duty position." *Gratzl v. Office of Chief Judges of 12th, 18th, 19th, & 22nd Judicial Circuits*, 601 F.3d 674, 680 (7th Cir. 2010). Imposing such a duty would effectively

"abolish (in whole or in part) the temporary disability program, leaving nothing for that group of employees." *Dalton*, 141 F.3d at 680 (having employer place permanently disabled employees in light-duty positions would amount to requiring employer "to create new full-time positions to accommodate its disabled employees, a course of action not required under the ADA"). In *Hendricks-Robinson v. Excel Corp.*, however, the Seventh Circuit found that there may be instances where light-duty jobs are not actually temporary jobs but rather vacant permanent jobs and thus potentially available for permanent reassignment. 154 F.3d 685, 697–98 (7th Cir. 1998). But temporary light-duty positions are not considered permanent just because they are of indefinite duration. *See Williams v. Eastside Lumberyard & Supply Co.*, 190 F. Supp. 2d 1104, 1117 (S.D. Ill. 2001) ("While Eastside did accommodate Williams' temporary condition for two years, the duration of an arrangement to accommodate an employee's temporary condition is not, by itself, sufficient to show that the arrangement was meant to last forever."); *Pfeifer v. Caterpillar Inc.*, No. 98 C 542, 2000 WL 310312, at *6 (N.D. Ill. Mar. 24, 2000) (plaintiff not "entitled to a trial on an ADA claim merely because his employer offers temporary positions of indefinite duration to disabled employees").

Petersen's argument, although undeveloped, could be interpreted as one that because Hansen was allowed to remain in light-duty status until retirement, light-duty status was essentially a permanent position (or at least that there is a question of fact as to whether it is) and thus that it was unreasonable for the Navy not to allow him to remain in that position until an LEO-eligible position became available. In fact, a court in the Southern District of Illinois described a situation similar to Hansen's as an example of where a light-duty assignment might be considered permanent: "Evidence that a light-duty assignment is permanent would have consisted of evidence that an employer allowed its employee to continue doing light-duty

assignments *after* knowing that the employee was *permanently*, medically restricted from ever again working in his original position." *Williams*, 190 F. Supp. 2d at 1118; *see also Lutter v. Rinella Beverage Co.*, No. 00 C 8024, 2004 WL 419826, at *12 (N.D. Ill. Feb. 5, 2004) (finding issue of fact as to whether position was permanent or temporary where plaintiff had remained in light-duty position through termination even though he had made clear to employer and doctor that he could not perform previous position and doctor had provided note saying it was doubtful plaintiff could return to full-duty work with or without surgery several months earlier).

Petersen has presented evidence that the Fire Department did not strictly enforce its light-duty policy, allowing injured employees to remain there for indefinite periods of time even after it was medically determined they could not return to full-duty status. There is also evidence that Petersen consistently requested reassignment to an LEO-eligible position so as not to lose those accrued benefits. Although the Navy was not required to provide Petersen with his requested accommodations if they were not available, *see Gile*, 95 F.3d at 499, Petersen's request to remain in an LEO-eligible position is nonetheless relevant to determining whether the Navy's accommodation was reasonable, *see Rehling v. City of Chicago*, 207 F.3d 1009, 1014 (7th Cir. 2000) (request to remain in particular district "relevant to, but not dispositive of, [plaintiff's] reasonable accommodation claim"). Based on the Navy's past practice of allowing Hansen to remain on light-duty status after it was medically determined he could not return to his full-duty position, Petersen has raised a question as to whether it would have been reasonable for the Navy to allow Petersen to remain on light-duty status until an LEO-eligible position became available. Thus, summary judgment is denied on the failure to accommodate claim.

## II.    Age Discrimination Claim

Petersen claims the Navy's decision not to allow him to remain on light-duty status and to assign him to a non-LEO-eligible position also amounts to age discrimination.  Although the Navy is prohibited from discriminating against Petersen because of his age, Petersen must show that age was the "but-for" cause of the Navy's adverse action.  *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009).  Petersen may prove age discrimination under the direct or indirect method of proof.  *Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1157 (7th Cir. 2014).  Petersen purportedly proceeds under both methods.  To survive summary judgment under the direct method, Petersen "must offer evidence from which an inference of discriminatory intent can be drawn, such as: (1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action."  *Teruggi v. CIT Grp./Capital Fin., Inc.*, 709 F.3d 654, 659–60 (7th Cir. 2013) (citation omitted) (internal quotation marks omitted).  This circumstantial evidence may be combined to present a "convincing mosaic" of discrimination as long as it directly points to a discriminatory reason for the Navy's action and is directly related to the Navy's decision to place him in the dispatch supervisor position and not let him remain on light duty.  *Id.*  Under the indirect method, Petersen may establish a *prima facie* case of age discrimination by showing (1) he was a member of a protected class, (2) he was meeting the Navy's legitimate job expectations, (3) he suffered an adverse employment action, and (4) the Navy treated similarly situated employees younger than him more favorably.  *Hutt v. AbbVie Prods. LLC*, 757 F.3d 687, 693 (7th Cir. 2014).

Petersen's claim fails under either method. Petersen relies on a letter he received from Rodriguez on October 20, 2011, after he accepted the dispatch supervisor position, which explained that the LEO benefit was established to provide an early retirement benefit for certain positions—those comprised of "young men and women physically capable of meeting the vigorous demands of occupations that are far more physically taxing than most in the Federal service." Ex. 13 to Joint Stmt. of Material Facts at 1. Rodriguez continued that a primary position for LEO benefit purposes has a maximum entry age and certain physical qualifications, thus restricting the role to "young and physically rigorous individuals, whose primary duties are to perform work directly connected with controlling and extinguishing fires." *Id.* Petersen argues that Rodriguez's letter demonstrates the Navy's intention not to assign him to an LEO-eligible position because he was not "young." But even drawing all inferences in Petersen's favor, the letter does not support Petersen's age discrimination claim. The letter explains the special retirement benefits given to firefighters, a position even Petersen agrees he could no longer perform once his doctor determined he was permanently disabled. The letter says nothing about the Navy's intentions with respect to Petersen or its views on his age. If anything, it underscores the fact that had Petersen been deemed physically able to perform the firefighter/paramedic position, the Navy would have returned him to that position but because he did not meet the physical qualifications required for the position, it did not.

Petersen also argues that the Navy treated Peters, who is younger than him, more favorably. But Peters is not similarly situated to Petersen—at least one doctor found Peters able to return to his work as a firefighter and thus Peters remained on light-duty status until the conflict between his doctors was resolved. Petersen encountered no such disagreement among his doctors and so only remained on light-duty status until his doctor found him to be

16

permanently disabled, at which point the Navy sought a permanent reassignment for him. And when the Navy sought to place Peters in a different position (which was before Petersen was found permanently disabled), there was an open LEO-eligible position. But at the time the Navy sought to reassign Petersen, there were no vacant LEO-eligible positions. These circumstances differentiate Peters and Petersen so as to distinguish the Navy's treatment of them. *See Coleman v. Donahoe*, 667 F.3d 835, 846–47 (7th Cir. 2012) (although there need not be "one-to-one mapping between employees," a plaintiff must show at least that the comparators "dealt with the same supervisor," "were subject to the same standards," and "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them" (citations omitted) (internal quotation marks omitted)). A reasonable jury could thus not infer that Petersen was treated worse than Peters because of his age. Without a comparator, Petersen's age discrimination claim fails under the indirect method, *see Chaib v. Indiana*, 744 F.3d 974, 984 (7th Cir. 2014), and he has one less piece of evidence to use in attempting to construct a "convincing mosaic" of discrimination under the direct method.

Finally, Petersen argues that the Navy's reasons for not offering him the fire inspector position are pretextual. He points to the fact that Chaney and Arndt provided conflicting accounts as to why he was not offered the position when it became available, with Chaney testifying that he believed it was due to budgetary constraints and Arndt testifying that he thought it was because Petersen had already been placed in the dispatch supervisor position. But this misses the point, as the Navy did offer Petersen the fire inspector position after Peters rejected it. Although there are other legal issues surrounding that offer, as discussed below, there is no indication in the record that age discrimination was at play. Chaney's and Arndt's beliefs are thus irrelevant to a pretext determination, as they do not provide any insight into whether the

Navy's reasons for moving Petersen from light-duty status to a non-LEO-eligible position were a pretext for age discrimination. Because Petersen has not identified a genuine issue of fact on his age discrimination claim, summary judgment is granted for the Navy.

## III. Retaliation Claim[4]

As with his age discrimination claim, Petersen may seek to establish his retaliation claim under the Rehabilitation Act using either the direct or indirect method of proof. *Anderson v. Donahoe*, 699 F.3d 989, 994–95 (7th Cir. 2012). Under the direct method, Petersen must provide evidence that (1) he engaged in protected conduct, (2) he was subjected to an adverse employment action, and (3) the protected conduct caused the adverse employment action. *Id.* Under the indirect method, Petersen must first demonstrate that (1) he engaged in protected conduct, (2) he was subjected to an adverse employment action, (3) he performed his job satisfactorily, and (4) a similarly situated employee who did not engage in protected conduct was treated more favorably. *Bellino v. Peters*, 530 F.3d 543, 551 (7th Cir. 2008). If he makes this *prima facie* showing, then the burden shifts to the Navy to articulate a legitimate reason for the adverse action, after which Petersen must show that the reason is pretextual. *Id.*

Although the record does not include Petersen's EEO charge, there is no dispute that Petersen engaged in statutorily protected activity by filing an EEO charge in November 2011.[5]

---

[4] In Petersen's complaint, he purports to bring his retaliation claim under both Title VII and the Rehabilitation Act. But Title VII's retaliation provision only applies to protected activity related to the plaintiff's protected class, i.e. the plaintiff's "race, color, religion, sex, or national origin." 42 U.S.C. §§ 2000e-2(a), 2000e-3(a). Petersen does not claim that his EEO charge was based on race, color, religion, sex, or national origin nor is there any evidence in the record related to these protected classes. Instead, the only evidence in the record relates to his disability and so the Court will analyze his retaliation claim only under the Rehabilitation Act. This analysis, however, is identical to that under Title VII. *See Burks v. Wisconsin Dep't of Transp.*, 464 F.3d 744, 758 n.16 (7th Cir. 2006).

[5] The Navy also mentions informal complaints that Petersen made regarding the transfer to the dispatch supervisor position, but Petersen did not allege in his complaint that this constituted protected activity nor does he argue in his response that this constitutes protected activity, focusing instead only on his EEO charge. The Court will do the same.

18

*See Anderson*, 699 F.3d at 995. The Navy argues, however, that under either method, Petersen cannot establish that he suffered an adverse action. Petersen claims that placement into the dispatch supervisor position qualifies as an adverse employment action, as he lost overtime compensation and LEO benefits. *See Crady v. Liberty Nat'l Bank & Trust Co. of Indiana*, 993 F.2d 132, 136 (7th Cir. 1993) (materially adverse action may include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loos of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation"). But his reassignment to the dispatch supervisor position is what gave rise to his EEO complaint. Because the reassignment was the cause—not the result—of the EEO complaint, it cannot be considered an actionable adverse action for purposes of Petersen's retaliation claim under either the direct or indirect method of proof. *See Huppert v. Potter*, 232 F. App'x 576, 581 (7th Cir. 2007) (plaintiff could not support retaliation claim where only adverse actions plaintiff suffered were those that caused him to file the grievances that constituted the protected conduct); *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 668–69 (7th Cir. 2006) (employer must know of protected activity before any adverse actions it took can be found retaliatory under either the direct or indirect method of proof); *Dudley v. Bellwood Sch. Dist. No. 88*, No. 11 C 8180, 2013 WL 1873335, at *6 (N.D. Ill. May 3, 2013) ("To sustain a Title VII retaliation claim under either the direct or indirect methods, [plaintiff] must have engaged in some protected activity prior to the employer's adverse actions taken in retaliation for exercising her right to engage in a protected activity.").

Alternatively, Petersen appears to argue that the Navy retaliated against him by refusing to offer him the fire inspector position after Peters rejected it in December 2011 and conditioning any offer on a settlement of his EEO complaint. The Court cannot accept Petersen's argument

that the Navy refused to offer him the fire inspector position, as he testified at his deposition that the position was offered to him during the mediation of his EEO complaint and that he rejected the offer because he considered the position to be a further demotion.  But that still leaves his complaint that the Navy only offered him the fire inspector position in December 2011 as a settlement of his EEO complaint.  The Navy contends that this cannot be an adverse action and instead argues that the Navy's actions in seeking to place Petersen in the inspector job were done as a courtesy and so cannot be considered retaliatory.  Petersen argues in response that the fire inspector position could have been offered to him once Peters rejected it and that there was no valid reason for the Navy to refuse to discuss the option with him unless he agreed to drop his EEO charge.  Neither side cites to supporting case law, however, leaving the Court to do its own research into the issue.

There is some support for the Navy's position that its decision to use the fire inspector position as part of a settlement of Petersen's EEO charge does not amount to an adverse action. The Seventh Circuit has held that "an adverse employment action does not include an employer's refusal to grant an employee a discretionary benefit to which she is not automatically entitled." *Hottenroth v. Vill. of Slinger*, 388 F.3d 1015, 1033 (7th Cir. 2004).  Thus, for example, the decision not to offer an employee a severance package unless he agrees to a release of legal claims is not considered an adverse action in the Seventh Circuit unless the employee is entitled to severance by contract.  *See, e.g.*, *Sicher v. Merrill Lynch*, No. 09 C 1825, 2011 WL 892746, at *4 (N.D. Ill. Mar. 9, 2011) ("Payments offered to a former employee in exchange for a release of legal claims—whether the parties call the payment a severance or a settlement—are a discretionary benefit and do not constitute adverse employment action where those payments are not required by a contract.").  In other situations where an EEO complaint or grievance has been

20

filed after an employee has been terminated, district courts have found that the employee cannot base a retaliation claim on offers providing for reinstatement or conditional extensions of discretionary employment in exchange for settlement of the grievance. *See, e.g.*, *Madray v. Long Island Univ.*, No. 10-CV-3841(ADS)(WDW), 2012 WL 2923500, at *12 (E.D.N.Y. July 16, 2012) (plaintiff could not base retaliation claim on a letter offering to settle her grievance in exchange for a conditional extension of her discretionary employment and a third opportunity to apply for tenure); *Penny v. Winthrop-Univ. Hosp.*, 883 F. Supp. 839, 845 (E.D.N.Y. 1995) (plaintiff could not amend complaint to add retaliation claim where defendant offered plaintiff conditional employment in attempt to settle grievance regarding alleged discriminatory termination).

Although a settlement offer normally cannot be considered retaliatory, the withholding of a benefit to which an employee would otherwise be entitled may amount to an adverse action. *See Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1260 & n.8 (11th Cir. 2012). In *Gate Gourmet*, for example, there was evidence that although it was company policy that employees be given light-duty jobs if they needed them because of medical conditions, once the employer learned the employee had filed an EEOC charge, the employer made a conditional offer to place the employee in a light-duty position only if she dropped that charge. *Id.* at 1258–59. The Eleventh Circuit found that "[w]ithholding a position that an employee would otherwise receive under company policy, particularly when it results in her no longer having a job, might well dissuade a reasonable worker from making or supporting a charge of discrimination" and thus the employee had suffered from a materially adverse action. *Id.* at 1259.

Here, there is a question as to whether Petersen was entitled to placement in the fire inspector (or any other LEO-eligible) position under Navy policy. The Court has found a dispute

as to whether the Navy failed to accommodate Petersen by not letting him remain on light-duty status until an LEO-eligible position became available, which would affect this analysis. The parties also have not addressed whether, after Petersen was in the dispatch supervisor position, reassignment to the fire inspector position would be considered an entitlement or a discretionary benefit. There is evidence in the record that both O'Hara and Chaney believed that the fire inspector position could have been offered to Petersen outside the EEO conciliation process. But unlike in *Gate Gourmet*, conditioning the fire inspector offer on dropping the EEO charge did not result in Petersen not having a job, as he remained in his dispatch supervisor position. The Court is thus left with unanswered questions that cannot be resolved on this record as to whether the Navy's conditional offer constitutes an adverse action.[6] *Cf. Hottenroth*, 388 F.3d at 1033 (plaintiff could not establish adverse action where she did not suggest that she was entitled to have a new position created for her).

Finally, if proceeding under the direct method, Petersen must present evidence of a causal connection between his protected activity and the adverse action, which may be done through direct evidence (i.e., "an admission by the employer of discriminatory animus") or circumstantial evidence (i.e., "suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was

---

[6] The fact that Petersen testified that he rejected the fire inspector position does not affect the analysis because "[t]he showing a plaintiff must make to set out an adverse employment action required for a retaliation claim is lower than that required for a discrimination claim; a plaintiff must only show that the employer's action would cause a 'reasonable worker' to be dissuaded from making or supporting a charge of discrimination." *Chaib*, 744 F.3d at 986–87 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)). Conditioning the fire inspector position offer on dropping the EEO complaint could on its own be an adverse action, then, without needing to consider Petersen's response to the offer. *See Robin v. City of Monrovia*, 520 F. App'x 496, 498 (9th Cir. 2013) (plaintiff was entitled to jury instruction on theory that mere offer of settlement agreement that did not comply with statute, despite fact that she did not accept it, was retaliatory); *Norden v. Samper*, 503 F. Supp. 2d 130, 159 (D.D.C. 2007) (when employer presented return to work program containing offensive terms as offer to settle EEO complaint, "the adverse act was a *fait accompli*").

pretextual"). *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015). O'Hara stated in an email to others involved in the decision that "[r]ather than moving forward with the reassignment back, it would be best to use the reassignment as part of a written settlement with Mr. Petersen." Ex. 18 to Joint Stmt. of Material Facts at 3. Petersen also testified that Chaney told him at an EEO mediation that the only way that Petersen would receive any of the positions he requested was if he stopped filing EEO complaints. A reasonable trier of fact could infer retaliation from these statements, allowing Petersen to proceed on his retaliation claim. *See Castro v. DeVry Univ., Inc.*, --- F.3d ----, 2015 WL 2231823, at *2 (7th Cir. May 13, 2015) (fundamental question in retaliation case is "could a reasonable trier of fact infer retaliation").[7]

## CONCLUSION

For the foregoing reasons, the Navy's motion for summary judgment [40] is granted in part and denied in part. Summary judgment is granted for the Navy on Petersen's age discrimination claim (Count III).

Dated: June 29, 2015

SARA L. ELLIS
United States District Judge

---

[7] Because the Court finds that Petersen may proceed on his retaliation claim under the direct method, it need not consider his alternative argument that he has produced sufficient evidence to proceed under the indirect method as well.